KING *v.* KELLOGG.

[75 South. 134, Division B.]

1. APPEAL AND ERROR. *Former appeal. Law of the case.*
   An opinion rendered by the supreme court on a former appeal becomes the law of the case and controls subsequent appeals.

2. GIFTS. *Security for advances to tenant. Sufficiency of evidence.*
   Under the facts in this case the court held the evidence sufficient to show that the assignment of the insurance policy by the tenant to the landlord was not a gift but was made as a collateral security for advances.

3. BANKRUPTCY. *Waiver of exemptions. Insurance policy assigned as collateral.*
   An insurance policy assigned as collateral to secure advances,

is exempt in bankruptcy proceedings, although payable to the assignees absolutely.

4. BANKRUPTCY. *Debts discharged. Unliquidated demands. Security.*
   Where a tenant assigned an insurance policy to his landlord only to secure advances to make a crop, in a suit by the tenant's administratrix against the landlord to recover the proceeds of such policy, it was error to permit the landlord to set off other debts when the tenant had been discharged in bankruptcy from such debts.

5. BANKRUPTCY. *Discharge. Secured debts. Burden of proof.*
   The burden was on the landlord who alleged an assignment of his tenant's insurance policy as collateral to show what debts the assignment covered where the tenant's unliquidated debts had been discharged in bankruptcy.

6. COMPROMISE AND SETTLEMENT. *Sufficiency of evidence.*
   Under the facts in this case the court held that the evidence showed that the landlord and tenant had made a full settlement of all claims pleaded by the landlord in set off to the action by the administratrix of the tenant to recover the proceeds from insurance policies assigned as collateral security by the tenant.

APPEAL from the chancery court of Yazoo county.

HON. O. B. TAYLOR, Chancellor.

Suit by Letita King, Administratix of the Estate of C. L. King against J. M. Kellogg, executor of the estate of M. R. Miles. From a decree for plaintiff, defendant appeals and complainant cross-appeals.

The facts are fully stated in the opinion of the court.

*E. F. Noel,* for appellant.

*E. L. Brown* and *Watkins & Watkins* for appellee.

STEVENS, J., delivered the opinion of the court.

This is the second appearance of this cause in this court, as shown by the reported case of *King* v. *Miles,* 108 Miss. 732, 67 So. 182. There appears some confusion in the briefs as to the styling of the case, due to the fact that there is a direct and cross-appeal now before us. We shall consider Mr. Kellogg, the executor of the estate of Mrs. M. R. Miles, deceased, as the appellant, and Miss Letitia King, the administratix of C. L. King's estate, as appellee and cross-complainant. Counsel for appellant concedes in his brief that "prac-

tically the same questions, except as to objections to evidence, were involved'' in the first appeal.

The opinion heretofore written in this case conclusively settles several points of law now argued afresh, and we must follow the law of the case as announced on the first appeal. The conclusions reached by the court are sound, regardless of any ''law of the case'' doctrine. With this preliminary statement, we shall proceed to a discussion of such parts of the testimony and the law applicable thereto as is necessary, without undertaking the arduous task of making a complete and separate statement of the facts.

Mrs. M. R. Miles in her lifetime owned two valuable plantations, Mileston and Good Hope. Both of these plantations in the year 1902 she leased to C. L. King. The first lease expired in 1905, and was renewed to run until the end of the crop year 1908. It appears that Mr. King, the tenant, had limited means of his own, and it was necessary for Mrs. Miles, as the landowner, to furnish her said tenant with large sums of money each year with which to make and gather the crops. These advances ran from a thousand to fifteen hundred dollars per month. In March 1903, Mr. King, as the owner of a policy of life insurance on his own life, in the sum of five thousand dollars, payable to his executors, administrators, or assigns, assigned the policy to Mrs. Miles, and in June, 1903, another policy for a like amount, and payable to his estate, was also assigned to Mrs. Miles. These policies were retained by Mrs. Miles until after the death of Mr. King, which occurred October 28, 1911, and on December 3, 1911, Mrs. Miles made proof of King's death and collected the full amount of insurance. Miss Letitia King was appointed administratix of his estate, and exhibited her bill in equity as administratrix to recover the proceeds of this insurance from Mrs. Miles. At the time this suit was instituted Mrs. Miles was living and resided in the city of New Orleans, but pending litigation she died, and

Mr. Kellogg has qualified as her executor. The bill charges that the policies of insurance were originally assigned to Mrs. Miles as security for advances then being made, and that by tacit agreement were retained as security for advances during the next and each successive crop year. It is charged in the bill that all advances which Mrs. Miles made to King had been fully repaid, and accordingly Mrs. Miles had no interest in the proceeds of these policies. The bill was answered, and the answer made a cross-bill. This answer and cross-bill refers to and expressly incorporates as a part thereof the pleadings of a former chancery suit which sheds light upon the present controversy, and to which it is proper to make brief reference. At the termination of Mr. King's lease in 1908, it appears that he was financially involved and owed various creditors, some of whom had judgments. King thereupon filed a voluntary petition in bankruptcy, E. L. Trenholm was appointed trustee in bankruptcy, and King's affairs were duly administered in and by the bankrupt court, and King was in due time discharged. Mr. Trenholm, as trustee, filed a bill in equity against Mrs. Miles, in which he sought to recover, and did successfully recover, upon three accounts or claims: first, usurious interest; second, overcharges in rents; and, third, certain premiums paid by King while he was insolvent, upon the two policies of insurance then held by Mrs. Miles. It was the theory of the trustee in bankruptcy that King had assigned and delivered the life insurance policies to Mrs. Miles as a gift. Mrs. Miles, in answering the trustee's bill, adopted this theory of the assignment of the insurance policies, and represented in and by her answer that the policies had been given to her by Mr. King. The chancellor then rendered the decree, the material portion of which has already been stated in the former opinion in this case. Mrs. Miles was taxed with the insurance premiums upon the theory that King should not in equity take money belonging to his

creditors and keep alive insurance which he was voluntarily giving his landlord. The total sum recovered by Trenholm, trustee, was six thousand, five hundred dollars, and this amount Mrs. Miles paid without even prosecuting an appeal to this court. The main point settled by the court in the first opinion in the present case was whether the decree in the Trenholm suit was *res adjudicata* of the issues here presented. The court has expressly ruled that the parties and the issue are different, and in so doing has settled absolutely the right of King's administratix to maintain the present action. The answer and cross-bill in the present case, instead of repudiating the theory upon which the Trenholm suit was tried, readopts the averments of the answer to the Trenholm suit, and expressly says in part as follows:

"Respondent further states that in her answer to the amended bill in said cause, in reference to ownership and payment of premiums on the policies referred to in the preceding paragraph, she answered, in effect, denying that any of the premiums on either policy charged to King had been actually repaid to her by King; denying that she knew that said King was wholly insolvent at the time of making said payment on any of them, and stating that said policies were transferred and delivered to her absolutely and unconditionally by said King; that after the said transfer and delivery, the defendant had the right at all times to surrender the said policies and obtain therefor any cash surrender value that said policies had earned; that she did not surrender said policies for their cash surrender value, for the reason that C. L. King requested her to pay the premiums, keep up the policies, and charge the premiums to him, and that it was a matter of grace on her part as to whether she did or not, even if said King repaid; that said policies were paid at the earnest solicitations of C. L. King, and are still owing to her by said C. L. King; and stating further as to each policy: 'Defendant

further shows unto the court that, even if she is mis-
taken as to the legal effect of the said assignment of
said policy and the court should hold on the facts that
the said policy was assigned to her as collateral and
not absolutely, then she is advised and believes that,
before she should be caused to surrender the said policy,
the complainant, the trustee of the said bankrupt, King,
should repay to her, with legal interest thereon, all the
premiums paid by her on account of the said policy.' "

Notwithstanding the fact that the chancellor in dis-
posing of the trustee's suit charged Mrs. Miles with
the total sum of six thousand five hundred dollars for
usury, rents, and premiums, a recovery was permitted
without any apparent effort on the part of Mrs. Miles
to offset various items now attempted to be offset and
recovered in her cross-appeal. She now seeks to recover
on certain promissory notes executed by King in his
lifetime, and which she claims to be unpaid, the value of
four thousand bushels of corn loaned by King and not
returned, various payments of premiums expended by
her in keeping alive the said policies of insurance, the
value of cotton seed alleged to have been loaned and
not returned, and large damages claimed for a breach
of King's covenants to keep the buildings and cabins in
repair. The material findings of the chancellor in the
present suit are as follows:

"(1)  That the insurance policies were held by de-
fendant's testatrix in pledge, and not as a gift, to se-
cure any and all indebtedness owing to her by complain-
ant's intestate; and

"(2)  That the notes given by C. L. King, deceased,
to Mrs. Miles each year, for advances, stipulated for
usury, and only the principal of each note for each year,
should be collected; and

"(3) That the principle of the sum as claimed by the
defendant against the complainant, after eliminating a
clerical error of one hundred dollars, as shown by her

Exhibit U, amounted to the sum of three thousand, four dollars and sixty-six cents; and

"(4) That this principal sum of three thousand four dollars and sixty-six cents included a double charge of the item of one hundred ninety-seven dollars and seventy-five cents, premium on insurance in the account for 1904; that said Exhibit D for said year fails to give credit for mule killed and paid for by the railroad in the sum of one hundred eighty dollars, which said sum is shown to have been applied as a payment on insurance premium of two hundred, five dollars and sixty cents; that the amount for that year as stated by said exhibit contains a double charge of two hundred seventy-six dollars and seventy-five cents, whereas the same, having been made to cover the proceeds of cotton delivered in excess of rental for that year, should not have been charged at all;

"(5) That the advances made by defendant to King in excess of the notes mentioned in paragraph 2 were not tainted with usury, and bore interest from the time made until the proceeds of the crop for each year equalled or exceded these advances; and

"(6) That the amounts mentioned in paragraph 4 for which King should have credit and the interest which he should pay Mrs. Miles as mentioned in paragraph 5 should and do offset each the other; and

"(7) That the amount of rents charged King for Mileston in Exhibit D have been made excessive, and exceed the true amount so chargeable, in the sum of five thousand seven hundred thirty-five dollars and fifty-six cents; and

"(8) That, while the principal sum claimed by defendant in Exhibit U against the complainant amounted to the sum of three thousand four dollars and sixty-six cents, yet this result was reached by raising the rents in the sum of five thousand seven hundred thirty-five dollars and fifty-six cents, and when this is eliminated, it leaves a balance due to King

by Mrs. Miles on January 1, 1909, of two thousand, seven hundred, thirty dollars and ninety cents; and

"(9) That on this date, January 1, 1909, King owed defendant the sum of four thousand six hundred ten dollars and ninty-two cents for and on account of his failure to repair house; the sum of one thousand dollars for corn owing and not delivered; the sum of five hundred twenty dollars for cotton seed owing and not delivered, all according to the terms of his lease contract; and the further sum of three hundred, sixty-four dollars and ninety-six cents due on notes which were not usurious, as interest and for interest on the Collier rent collected by him during the time held by him; all said sums making a total sum of six thousand, four hundred ninety-five dollars and eighty-eight cents due by King on that date to Mrs. Miles; and

"(10) That, by subtracting the amount of two thousand seven hundred ninety dollars and thirty cents due by Mrs. Miles to King as mentioned in paragraph 8 from the sum of six thousand four hundred ninety-five dollars and eighty-eight cents due by King to Mrs. Miles, as mentioned in paragraph 9, it leaves a balance of three thousand seven hundred sixty-four dollars and ninety-eight cents due by King to Mrs. Miles on January 1, 1909, on which amount she is equitably entitled to interest until paid on December 3, 1911, making a total amount due her on that date of four thousand four hundred twenty-five dollars and sixty cents; and

"(11) That on December 3, 1911, Mrs. Miles collected from the insurance company the sum of ten thousand dollars, and from this sum she was entitled to reserve the said sum of four thousand four hundred twenty-five dollars and sixty cents due her by King's estate, which left a balance of five thousand, five hundred seventy-four dollars and forty cents due by her on that date to complainant. This sum, with interest to date, amounts to six thousand, eight hundred and forty-six dollars and twenty-five cents, for which amount the com--

plainant is entitled to a decree against the estate of Mrs. Miles; and

"(12) That this cause should be tried just as if suit No. 3631 of the general docket of this court, and set up as *res adjudicata,* had never been instituted, the rights of the parties here litigant not being affected thereby in any respect; that the complainant is not estopped by any matter pleaded as estoppel, or otherwise, to bring this suit; that the demands and claims of the said defendants are not barred by the statute of limitations, and are the proper subject-matter of set-off against the demands of the complainant made in this cause; that the same are not barred by the discharge in bankruptcy of said intestate, nor precluded by the settlement of the suit of defendant against N. H. Luse and C. L. King, mentioned in the pleadings, even though their lease contract for 1909 and subsequent years may have been made in the name of Luse, but really for the benefit and use of King, said matter not being decided, since it does not have any bearing in this suit between the parties themselves, therefore

"It is ordered, adjudged, and decreed, upon the findings of fact and law as above given, that Miss Letitia King, administratrix of the estate of C. L. King, deceased, do have and recover of and from J. M. Kellogg, executor of the estate of Mrs. M. R. Miles, the defendant, the sum of six thousand, eight hundred forty-six dollars and twenty-five cents, together with six per cent. interest thereon until paid, and costs of this suit, for all of which let execution issue, and that the objections of defendants to evidence offered by complainants, other than the depositions of C. L. King, which are sustained as to said depositions, be and the same are hereby overruled, to which ruling the defendants then and there excepted."

The direct appeal of Mrs. Miles' executor challenges the right of King's administratrix to recover any portion of the insurance. The chancellor has expressly

found that the assignment of the policies did not constitute a gift, and in this finding he is abundantly supported by the testimony. The very correspondence of Mrs. Miles shows conclusively that the policies were transferred as collateral. In her letter of March 5, 1906, she says:

"Certain life, insurance policies have been transferred to me as collateral . . . I surely am entitled to some security for my immense advances . . . When the day comes that you owe me nothing, then I return and release these policies."

In a letter written by her attorney to Mr. King in 1909 it is stated that the insurance policies are "held as collateral security by her." We are next interested in knowing what the policies were designed to secure. On this both pleadings and proof are very unsatisfactory. We gather from the facts that the policies were originally assigned as security for supplies furnished by the landlord to her tenant, and by acquiescence more than by express contract they were retained from year to year for a like purpose. In addition to this security Mrs. Miles had her landlord's lien and her annual deed of trust on the crops securing advances. It appears that she furnished all supplies and received and sold all the crops from year to year. Her answer in the present suit concedes nothing and claims everything. By her pleading she would have the court to understand that she advanced more than she received back; that her advances were made to one whom she considered to be unable to repay if the crops did not repay her; that in fact she did not attempt to keep a full set of books; and she now produces and pleads as an offset unpaid promissory notes from year to year, the exact amounts of which she maintains have passed out of her memory. Mrs. Miles testified in the Trenholm suit and the large claims which she now makes in her answer and cross-appeal do not appear to be supported by any books or even by her own exhibits or statements

of account. We think she has utterly failed to establish any indebtedness due by King to her for supplies or upon promissory notes. The history of their transactions indicates that a settlement was had from year to year and new obligations taken at the beginning of every crop year. What we now say about any indebtedness by King is not directed to the offset for the value of corn and cotton seed and damages for failure to repair cabins, items to which we advert later.

We deem it unnecessary to discuss separately every point raised by counsel for appellant. It is contended that the decree in the Trenholm suit was *res adjudicata* of the issue here presented; and, although the point was ruled against appellant in the first opinion, the point is again argued anew. The views expressed in the opinion already delivered fully dispose of this question. It is contended that appellant paid the decree there entered under the belief and with the understanding that she would own absolutely the insurance policies. There is, however, no element of estoppel, and the payment of the decree would indicate that Mrs. Miles was a large debtor instead of a creditor of Mr. King. If King owed her past-due obligations at that time she could have offset them against the demands of King's trustee in bankruptcy. If King owed her for supplies for any one of the crop years, she certainly could have offset the amount of such supplies against the claim for overcharges and rents and for usury. The amount of premiums recovered back by the trustee constituted a small part of the decree. Furthermore we see no good reason why Mrs. Miles could not have then offered her claim for the value of corn and cotton seed not returned and for damages to cabins and asked that they be liquidated and offset. But more as to these items later. The proof in both suits abundantly establishes the fact of usury. Although Mrs. Miles advanced King from time to time during the year she charged full ten per cent. interest on all money advanced. We do not think the claim of

usury "is vague, indefinite," as contended by counsel for appellant. There is no merit in the argument that the moneys advanced to King were deposited in bank and kept idle subject to his use, and, therefore, ten per cent interest was earned.

There is no merit in the argument that these policies of insurance were not exempt because "payable to Mrs. Miles absolutely." This point was ruled against appellant in the first opinion. Certainly if Mrs. Miles held them as a pledge, the cash surrender value was exempt to King in his lifetime and the proceeds would be exempt subject only to the legitimate claims of the pledgee. The argument that Mr. King in listing the policies waived his exemption has no bearing upon the present issue. During King's lifetime he could only waive his exemption to cash surrender value. Certainly Mr. King after his death would have nothing to do with any waiver of the proceeds as exempt. It is not even intimated that the beneficiaries of his estate did anything since King's death indicating a waiver. But it was never shown that King waived even the cash surrender value.

Aside from any particular point raised and argued by counsel for appellant and looking to the whole case, we see no cause to disturb the findings of the chancellor whereby he brings Mrs. Miles out in debt to Mr. King January 1, 1909. We have no criticism to offer as to the chancellor's finding that Mrs. Miles, on January 1, 1909, owed King two thousand seven hundred thirty dollars and ninety cents. This brings us then to the discussion of the more important questions raised by the cross-appeal and to the findings of the chancellor shown by paragraphs 9, 10, 11, and 12 of his decree.

The chancellor held, and correctly so, that King's administratrix was entitled to recover the full sum of ten thousand dollars as the proceeds of insurance, subject, however, to any lawful offset held by Mrs. Miles for any balance of indebtedness secured by the

pledge. The chancellor then permitted Mrs. Miles'
estate to recover damages for failure to repair cabins
and the value of certain corn and cotton seed. It will
be observed from the final decree that five hundred and
twenty dollars was allowed for the value of cotton, one
thousand dollars for the value of corn, and four thousand
six hundred ten dollars and ninety-two cents damages
for failure to repair. There was a further allowance of
three hundred, sixty-four dollars and ninety-six cents as
interest on notes which were not usurious. The decree
strikes a balance between the amount due by Mrs. Miles
to King on January 1, 1909, and the amount due by
King to Mrs. Miles in paragraph 9 of the decree just
mentioned, and in this way adjudged that Mrs. Miles' es-
tate was entitled to offset the sum of four thousand four
hundred, twenty-five dollars and sixty cents against the
insurance. The allowance of these offsets, in our judg-
ment, cannot be upheld either upon the law or the facts.
In the first place it is very doubtful whether appellant,
by her pleadings, is in position to claim that these
several demands are secured by the policies. The
original bill in this cause charges that the policies
were delivered to Mrs. Miles as collateral security.
The answer and cross-bill of Mrs. Miles charges
that the policies represent a gift and not a security.
Conceding, however, that Mrs. Miles is entitled
in equity to depart from and contradict her pleadings,
and under all the circumstances to claim the benefit of
her security, it yet remains that the burden of proof
would be upon her to show exactly what indebtedness
the policies were intended to secure and did secure. The
proof fails to show that these policies were ever
pledged to indemnify Mrs. Miles against any damages
resulting from King's failure to keep the premises in
good repair and in tenantable condition. The letter of
Mrs. Miles introduced in evidence indicates that the
policies stood as security for advances to make the

crops. If the policies did not secure Mrs. Miles for these unliquidated damages, then Mrs. Miles' estate could not offset such demands in this action. If they were not secured items, then such unliquidated demands were fully discharged by bankruptcy. It is conceded that King was fully discharged from all provable debts and obligations.

But another and complete defense was shown against these cross-demands. In the latter part of the year 1908, when King's lease was expiring, it fully appears from the evidence that King contemplated taking the Bankruptcy Act, with the full knowledge and consent of Mrs. Miles. On November 28, 1909, Mrs. Miles' attorney wrote Mr. King a letter, which shows that a Mr. Luse was executing a new lease for the plantations, that King was getting ready to take the bankruptcy law, and that this plan was fully understood by all three parties. Other letters of the same import were introduced. The great weight of the testimony shows that King in fact renewed his lease of the plantations in the name of Luse. In the new lease agreement executed by Mr. Luse is the following provision:

"Said party of the first part also leases to said party of the second part the forty-six mules and four horses valued at one hundred fifty dollars each, and all wagons, cattle, agricultural implements and gear now on said plantation; and also agrees to deliver to the said party of the second part the four thousand bushels of corn now estimated to be on said plantation belonging to the said party of the first part, *under her agreement with her present tenant.* Also about twenty-five tons of cotton seed covered by said agreement, the same being estimated as sufficient cotton seed to plant said plantation."

The words we have underscored are significant.

The corn and cotton seed mentioned in this agreement appears to be the corn and cotton seed, the value of which the chancellor allowed as an offset. This agree-

ment is a demonstration of the fact that King had this corn and cotton seed on hand at the expiration of his lease, and that the same remained upon the premises for the use of the tenant under the new agreement, whether we regard this tenant as Luse or King. The proof further shows that the contract between Mrs. Miles and Luse was in writing, and that there is appended thereto the following additional agreement between Luse and King:

"In consideration of the agreement and assumption and promise to pay Mrs. M. R. Miles all advances of money and supplies by her as landlord for 1909 and the several sums of money mentioned in the foregoing contract and the further promise to faithfully keep and perform all of the obligations therein set forth, by C. L. King, assignee of this contract, I hereby transfer and assign all of my rights, title and interest in and to this contract and lease to C. L. King, provided said transfer is approved and accepted by Mrs. M. R. Miles, as provided herein.

"Witness our signatures this the 8th day of September, 1909.                                      N H. LUSE.
                                                  "C. L. KING.
                "I approve this transfer.
                      "_____."

The further written agreement is shown:

"Lexington, Miss., November 11, 1908. I agree to transfer lease for Mileston and Good Hope plantation in Holmes county, Mississippi, made and signed to-day by Mrs. Mary R. Miles and myself to Mr. C. L. King at such time as they may request.

"Witness our signatures this the 11th day of November, 1908.                          N. H. LUSE.
                          "MRS. MARY R. MILES."

The uncontradicted testimony shows further that Luse was not making a success during the crop year 1909, and that before the expiration of his first year Mrs. Miles instituted suit against him in the chancery

court, and had a receiver appointed for the plantations. It appears that she had made advances of money and supplies to Luse to make and gather the crops for both plantations for the year 1909, and was attempting to protect her interest. After the institution of this suit solicitors for both parties had conferences about this litigation, and an agreement of compromise was entered into by and between Mrs. Miles, N. H. Luse, and C. L. King. The agreement was reduced to writing and duly executed by all parties, by the terms of which immediate possession of the plantations and all property thereon was given to Mrs. Miles, and both Luse and King agreed to "remove personally from the said leased premises not later than Thursday, October 28, 1909." The suit of Mrs. Miles, asking for the appointment of a receiver was to be dismissed at complainant's cost. Mrs. Miles agreed to furnish the croppers and laborers for the balance of the crop year 1909, and to pay a certain indebtedness of six hundred seventy dollars to Phillip Liberto for supplies furnished Luse in operating the leased premises. All accounts, books, notes, and securities held by Luse against the subtenants and laborors were surrendered to Mrs. Miles, as well as all growing crops and interest therein. The contract has also this significant clause:

"This contract and agreement and fulfillment thereof by parties hereto is to operate as a full settlement of all matters between the said Mrs. M. R. Miles and N. H. Luse on account of said leased contract, deed of trust and chancery suit; and also as between the said Mrs. M. R. Miles and C. L. King in so far as said chancery suit and lease to N. H. Luse or any transfer or relinquishment thereof by said N. H. Luse to the said Mrs. M. R. Miles is concerned or involved."

Mr. King was a party to this agreement, and it appears to us that the entire agreement was intended to be a full settlement between all three parties. This

agreement, in connection with other testimony in the case, shows that Mr. Luse in renting the premises in his name in the year 1909 accepted the leased premises in the condition they were then in. No complaint was made by either Mrs. Miles or Luse of the condition of the cabins at that time. It is further shown that the corn and cotton seed, for which appellant sought recovery, was upon the plantation when Luse took charge, and was delivered to Luse. By the last agreement liability for its value was fully settled. This conclusion is reached, it matters not whether we consider Luse as trustee or a new tenant. The allowance to appellant of any secured indebtedness is not supported by the testimony. We believe that Luse, a near relative of King and an employee upon the plantation, was really acting for King in releasing the plantations for the year 1909, and it is manifest from the testimony that King never left the plantations until this final agreement was entered into by all three parties.

Applying, then, the law of this case as announced in the former opinion, the facts entitle the original complainant to a decree for the face value of the insurance, with six per cent. interest. The cross-bill of appellant should have been dismissed. The decree of the learned chancellor will be reversed and a decree entered here in favor of King's administratrix for ten thousand dollars, with interest at six per cent. from December 3, 1911, to date.

Reversed, and decree here for cross-appellant.

*Reversed.*